

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-17-00062-CV
_____

**IN THE INTEREST OF C.S. III, A CHILD**

On Appeal from the 99th District Court
Lubbock County, Texas
Trial Court No. 2015-517,776; Honorable Kara Darnell, Presiding

August 2, 2017

## MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

Appellant appeals the trial court's order terminating his parental rights to his son, C.S.[1]  By a single issue, he challenges the sufficiency of the evidence to support the trial court's best interest finding.  Appellant does not appeal that portion of the trial court's order finding termination was supported by two statutory grounds.  We affirm.

---

[1] To protect the privacy of the parties involved, we refer to them by their initials.  *See* TEX. FAM. CODE ANN. § 109.002(d) (West 2014).

BACKGROUND

C.S. was born in August of 2015. At the time of his birth, he had multiple health issues and both he and his mother, C.M., tested positive for drugs. He was premature (having been born at twenty-seven weeks), suffered from neonatal sepsis, respiratory distress, and poly-substance abuse.[2] His mother abandoned him at the hospital, and at the time of C.S.'s birth, Appellant was incarcerated due to a conviction for felon in possession of a firearm.[3]

In November 2015, prior to Appellant's release from prison, the Department filed its first amended petition to terminate the parental rights of both C.M. and Appellant pursuant to section 161.001(b)(1)(D), (E), (N), and (O) of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (N), (O) (West Supp. 2016).[4] At that time, the trial court also entered an *Order for Actions Necessary for Return of Child* which set forth the conditions necessary for the return of C.S. which required Appellant to complete all tasks and services specified in a service plan, as well as tasks and services adopted or ordered by the trial court in any subsequent service plans signed by or delivered to Appellant.

In July 2016, after Appellant's release, the trial court entered a subsequent family service plan that required, among other things, that he: (1) demonstrate the ability to provide adequate care for his son by following all medical advice for C.S., (2) participate

---

[2] His mother also tested positive for drugs at his birth. Her rights were also terminated and she does not appeal.

[3] Appellant was released from prison and placed on three-year supervised release in June of 2016.

[4] Hereafter, we will refer to provisions of the Texas Family Code as "section ____" and "§ ____."

in a psychological evaluation and follow any recommendations, (3) actively participate in visitation with C.S., (4) attend all medical appointments pertaining to his son to gain a better understanding of C.S.'s medical needs, (5) comply with his plan of service, (6) participate in individual counseling, (7) maintain safe and stable housing free of hazards and persons who pose a risk/safety concern or have a criminal or CPS history, (8) notify the Department of any change in employment or housing, (9) participate in random drug testing as requested by the Department understanding that a failure to appear for a drug test would be considered a positive result, (10) maintain stable, legal, and verifiable employment sufficient to meet the family's needs for shelter, food, transportation, and clothing, and (11) actively attend and participate in weekly NA/AA meetings, work the twelve steps of recovery, and obtain a sponsor to help in the recovery process.

On October 13, 2016, the trial court initiated its final hearing. At that hearing, Appellant testified he was unaware of C.M.'s drug usage or that she was pregnant until after he was incarcerated. C.S.'s caseworker, Jennifer Garlett, testified during the final hearing that Appellant admitted in a telephone call that he had a history of drug abuse and Appellant himself testified that "[d]rugs [had] . . . ruined [his] life in the past," but that he quit using drugs in January 2007 before he went to prison and has not used drugs since. Appellant further testified that while his son was in the hospital, he called to receive updates on his medical condition and contacted the Department requesting that it work with him after his upcoming release on federal probation. In the three months following his release, he visited with his son twice and missed a number of scheduled visitations due to work, car trouble, the weather, or for no excuse at all. Despite having received his service plan in June of 2015, by the time of the final hearing he had yet to

3

(1) schedule a psychological evaluation, (2) provide evidence of safe and stable housing, (3) appear for all his drug tests, (4) attend his son's medical appointments, (5) supply proof of stable employment, or (6) attend any NA/AA meetings.

In the months after his release, he indicated he had lived in four homes and had two different girlfriends—all while remaining married to C.M. At one point, Appellant requested that he be able to attend Saturday visitation because he was not working weekends; however, although the Department complied, he continued to miss his scheduled visitations.

He testified that for two weeks prior to the final hearing, he had been living in a four-bedroom, rent-to-own house belonging to the parents of his second girlfriend, Julia. If his son was placed with him, he would be living with Julia's three children, her disabled mother, and her father. Julia assisted her mother and took care of her children while her father worked two jobs. His plan was to put C.S. in daycare during the day and take care of him when he returned home from work in the evening. He was uncertain what daycare he would use. He also testified he was one class short of completing a parenting class at a church in Abilene and his weekly drug tests administered through federal probation were negative. He was unable, however, to supply proof of the federal drug testing results without filing a motion in federal court.

There was also evidence on Facebook that he had been photographed flashing gang signs since his release. Appellant testified he first became a member of the West Texas Tango gang when he was imprisoned in 2007; but, since his most recent release, he had ceased to be a member. He testified the signs could be interpreted as gang

4

signs in one sense, but in another, they could be interpreted merely as signs that he was in West Texas. Although there were also photographs showing he was in the presence of alcohol, he testified he was not drinking. Without a final ruling, the hearing was continued.

A permanency hearing was held on November 8, 2016. Following that hearing, the court entered an order finding that neither Appellant nor C.M. was willing or able to provide C.S. with a safe environment at that time. Accordingly, the court ordered that returning C.S. to either parent at that time was not in the child's best interest.

On January 5, 2017, the trial court convened a combination permanency/final hearing. Testimony established that Appellant had completed a psychological evaluation where he was classified as having an "adjustment disorder unspecified." The evaluation recommended that he go to weekly psychotherapy to focus on problem-solving, coping skills, and his capacity to make appropriate decisions. The evaluation also recommended that he cooperate fully with any recommendations based on his drug and alcohol assessment and there was a strong recommendation that he attend anger management classes because of his history of fighting while incarcerated. He also completed a parenting class. Under his federal release program, he testified that he completed an outpatient drug and alcohol counseling program and continued to participate in weekly drug tests. He had not attended NA/AA meetings or obtained a sponsor because he didn't believe he had a drug or alcohol problem. Neither had he

paid any court-ordered child support, contacted C.S.'s doctors to determine medical needs,[5] or completed a drug and alcohol assessment.

He testified he was working for a concrete contractor making $11.00 an hour and he continued to live with Julia and her family. Although he represented that he and Julia were still in a relationship, photographs from his Facebook page indicated that he and Julia were no longer "friends" and he had replaced her photograph with that of another woman. Although Julia's parents had criminal histories and served time in prison, he was not concerned because they had "paid their dues." He testified that if he were able to have his son, he would take two weeks off work and "figure it out as it comes."

Garlett testified that prior to his release, Appellant had called her monthly asking about his son. She provided him information regarding his service plan but he indicated there were no services available in prison. Upon his release, she set up a visit for him with his son (which he did not attend), spoke with him about his service plan, and assigned a courtesy worker to assist him in Abilene.[6]

Appellant was offered weekly visits with his son lasting two hours. He attended two visits between his release on June 26 and the October 13 hearing. From October to the present hearing, he was offered weekly visitations on Saturdays to accommodate his work schedule; however, he asked for visitation every other week because it was too difficult to make the weekly visits. From October 13 to the January 2017 hearing, he

---

[5] He testified C.S. was being seen by a doctor at a high-risk clinic. Although his son was not taking any medication, he had not contacted the doctor or the clinic. He testified that, if custody was granted, he could "go and do all that. That's not hard to do."

[6] A courtesy worker stays in contact with parents and helps them to set up services in their area.

visited C.S. an additional three times for a total of five visits since he was released from prison in June 2016. His excuses for canceling or not showing up at scheduled meetings included bad weather, work conflicts, and lack of transportation.

Garlett testified Appellant's living arrangements with Julia's family were uncertain, i.e., his courtesy worker had not seen Julia's house since November 2016. In November, Appellant met the courtesy worker at his grandmother's house rather than at Julia's house as requested. When she attempted to schedule a December visit, Appellant indicated that he was at his grandmother's house and he would no longer allow the Department to speak with Julia because the Department would not allow her to accompany him on his visits with C.S.[7] In December, they met again at his grandmother's house.

She further testified Appellant had not provided any verification of his employment or completion of a drug/alcohol assessment. Neither had he attended several required drug tests, appeared at scheduled visitations with C.S., provided any verification of attendance at NA/AA meetings, followed through on recommendations from his psychological evaluation, attended therapy and counseling since the first of October 2016, or continued individual counseling. According to her testimony, he never asked his courtesy worker about his son's medical condition or the care C.S. would require going forward. Furthermore, he never offered to attend C.S.'s medical appointments, nor had he spoken with C.S.'s current doctor at the high-risk clinic, or

---

[7] Julia was no longer allowed to be present during Appellant's visitations because Garlett was uncertain of the stability of Appellant's relationship with Julia and the primary purpose of the visits was to allow time for Appellant to bond with C.S.

requested to see his son's medical documentation. She further indicated C.S. does not attend daycare because his immune system is low.

Critical to the element in controversy, Garlett opined that returning C.S. to Appellant was not in the child's best interest. She testified Appellant had failed to alleviate the concerns that brought the child to the Department. Neither had he maintained contact to build a bond with C.S., maintained stable relationships, obtained stable housing, nor shown an interest in C.S.'s medical needs. She further testified Appellant was not concerned about Julia's parents' criminal records, nor the fact that they had been imprisoned.

On the other hand, she testified C.S. has been in a licensed foster home since July 26, 2016. She has visited the home on a monthly basis and observed that C.S. is making great strides developmentally and really growing in the home. The plan is for the foster family to adopt him. She indicated that she believed Appellant was no longer in a relationship with Julia, and although they had made attempts since October to visit Julia's home twice, they had been denied entry. At the conclusion of Garlett's testimony, the Department rested. The trial court ordered an expedited home study of Julia's residence and continued the hearing until January 27.

On January 27, the trial court heard testimony from three witnesses: Sara Bussey (Appellant's courtesy worker in Abilene), Appellant, and Michele Gonzales (Appellant's aunt). Bussey testified that, on January 5, she went to Julia's residence to do a walk-through in order to determine whether Appellant was living in the house. Julia was called home from work by her mother. Upon her arrival, Julia indicated the house

8

was in disarray and asked Bussey to return after she had an opportunity to clean it up. At Bussey's insistence, Julia permitted her to enter the house. The only evidence Julia presented to indicate that Appellant was living at the residence was some men's t-shirts hanging in her bedroom closet, a can of shaving cream, and a toothbrush. When Bussey returned the next day to perform a home study, Julia's mother informed her that C.S. was not going to live there and there was going to be no home study. Afterwards, she visited Appellant's grandmother's house and was told that Appellant did not live at either location. Later that day, Appellant called Bussey to inform her that he was getting his own apartment.

Appellant testified he was living in Julia's residence the last day of the hearing on January 5 but Julia's mother kicked him out because she did not want any involvement with the Department. He testified he spent the night at his sister's house and has since rented a small one-bedroom efficiency apartment. The apartment was his fifth residence since his release from prison.

Gonzales testified she brought Appellant to court that day. She indicated that Appellant had lived at Julia's residence until January 5. She testified that she moved in with Appellant's grandmother because she is feeble and cannot walk around. Gonzales indicated that Appellant's grandmother could not take care of a baby by herself.

In addition to terminating Appellant's parental rights at the hearing's conclusion, the trial court found that Appellant had not been truthful at the previous hearing when he testified that he lived at Julia's residence and that everyone who lived in the residence was willing and excited to take care of C.S. Based on the evidence, the trial court found

9

clear and convincing evidence to support termination under section 161.001(b)(1)(N) and (O). The trial court also found clear and convincing evidence that termination was in C.S.'s best interest.

APPLICABLE LAW

The natural right existing between parents and their children is of constitutional dimension. *See Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). *See also Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, termination proceedings are strictly construed in favor of the parent. *In re E.R.*, 385 S.W.3d 552, 563 (Tex. 2012). Parental rights, however, are not absolute, and it is essential that the emotional and physical interests of a child not be sacrificed merely to preserve those rights. *In re C.H.,* 89 S.W.3d 17, 26 (Tex. 2002).

The Texas Family Code permits a court to terminate the relationship between a parent and a child if the Department establishes (1) one or more acts or omissions enumerated under section 161.001(b)(1) and (2) that termination of that relationship is in the best interest of the child. *See* § 161.001(b)(1), (2) (West Supp. 2016); *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976). Only one statutory ground is required to support termination. *In re K.C.B.*, 280 S.W.3d 888, 894-95 (Tex. App.—Amarillo 2009, pet. denied). In cases involving involuntary termination of parental rights, the Due Process Clause of the United States Constitution and the Texas Family Code require application of the heightened standard of clear and convincing evidence. *See In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). *See also* § 161.206(a) (West 2014). "'Clear and convincing evidence' means the

10

measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." § 101.007 (West 2014).

Although evidence presented may be relevant to both the statutory grounds for termination and best interest, each element must be established separately and proof of one element does not relieve the burden of proving the other. *See In re C.H.,* 89 S.W.3d at 28. Because the trial court found that two statutory grounds support removal and Appellant has not appealed those findings, we focus our attention solely on his single issue related to the trial court's best interest finding.

STANDARD OF REVIEW

In a legal sufficiency challenge such as we have in this case, we credit evidence that supports the verdict if reasonable jurors could have done so and disregard contrary evidence unless reasonable jurors could not have done so. *In re K.M.L.*, 443 S.W.3d 101, 112-13 (Tex. 2014). However, the reviewing court should not disregard undisputed facts that do not support the verdict to determine whether there is clear and convincing evidence. *Id.* at 113. In cases requiring clear and convincing evidence, even evidence that does more than raise surmise and suspicion will not suffice unless that evidence is capable of producing a firm belief or conviction that the allegation is true. *Id.* If, after conducting a legal sufficiency review, a court determines that no reasonable fact finder could form a firm belief or conviction that the matter that must be proven is true, then the evidence is legally insufficient. *Id.* (citing *In re J.F.C.*, 96 S.W.3d at 266).

11

In a factual sufficiency review, a court of appeals must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing. *In re J.F.C.*, 96 S.W.3d at 266 (citing *In re C.H.*, 89 S.W.3d at 25). We must determine whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *In re J.F.C.*, 96 S.W.3d at 266. We also consider whether disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

ISSUE ONE

By his sole issue, Appellant maintains the evidence is insufficient to support the trial court's best interest finding, the second element necessary for upholding a termination order. We disagree.

SECTION 161.001(b)(2)—BEST INTEREST

The Department was required to prove by clear and convincing evidence that termination of Appellant's parental rights was in C.S.'s best interest. § 161.001(b)(2); *In re K.M.L.*, 443 S.W.3d at 116. Only if no reasonable fact finder could have formed a firm belief or conviction that termination of his parental rights was in the child's best interest can we conclude the evidence is legally insufficient. *Id.* (citing *In re J.F.C.*, 96 S.W.3d at 266).

There is a strong presumption that the best interest of the child will be served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In reviewing the placement of children under the care of the Department, prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. *See* § 263.307(a). In deciding the best interest of a child, section 263.307(b) provides a non-exhaustive list of factors to consider. Similarly, the Supreme Court has set out other factors to consider. *See Holley*, 544 S.W.2d at 371-72. Those factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individual seeking custody; (5) the programs available to assist the individual to promote the best interest of the child; (6) the plans for the child by the individual or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.*

Evidence that supports one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *See In re C.H.*, 89 S.W.3d at 28. *See also In re E.C.R.*, 402 S.W.3d 239, 249-50 (Tex. 2013). The best interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as direct evidence. *See In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). Additionally, a child's need for permanence through the establishment of a "stable, permanent home" has been

13

recognized as the paramount consideration in determining best interest. *See In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.).

ANALYSIS

In support of his contention that it is in C.S.'s best interest to reside with him, Appellant challenges the evidence relied upon by the court to support termination of his parental rights. He asserts he was not at fault for the original circumstances that caused C.S. to be in a foster home, has been drug-free, has obtained employment and a home, has family support to help him care for C.S., and plans to place C.S. in a daycare while he works.

From the record we can see C.S. was very young at the time of the final hearing and there is no evidence of his desires. When a child is too young to express his desires, the fact finder may consider whether the child has bonded with his foster family, is well-cared for by the family, and has spent minimal time with a parent. *In the Interest of S.R.*, 452 S.W.3d 351, 369 Tex. App.—Houston [14th Dist.] 2015, pet. denied).

Since Appellant was released from incarceration in June 2016, he visited C.S. a total of ten hours or five, two-hour visits. On several visitations, Appellant's one-on-one time with his son was lessened by the presence of persons accompanying him. Further, Appellant was a no show or canceled many scheduled visits because of transportation issues, job conflicts, or financial concerns. On the other hand, C.S. has spent in excess of six months bonding with his foster parents while his medical needs were being met and he was making significant developmental improvements. Accordingly, this *Holley* factor weighs against Appellant.

The second *Holley* factor relating to whether a parent can meet the physical and emotional needs of the child also weighs against Appellant. C.S. has always been a special-needs child due to his mother's drug use while she was pregnant and his premature birth. Appellant has shown little or no interest in meeting his son's future medical needs. He has not spoken with his son's doctors, visited the high-risk clinic where he is treated, attended any of his medical appointments, requested to see C.S.'s medical documentation, or otherwise inquired of his son's medical condition after his release. Importantly, he shared no future arrangements he might have with the trial court about C.S.'s future medical treatment other than to say he has found a doctor, and if his son was placed with him, he could "go and do all that. That's not hard to do."

The third *Holley* factor relating to whether the child will be exposed to emotional and physical danger in the future also weighs against Appellant. He did not provide any evidence related to the persons C.S. might be exposed to in his daily life if he were placed with him and was unconcerned that two members of the household where he had proposed to place his son had criminal records and had previously served time in prison. Whereas, if C.S. remains in his present foster household, he will be living in a proven, safe environment.

There is also little, if any, evidence of record regarding the fourth *Holley* factor, i.e., Appellant's ability to parent C.S. Since Appellant was released from incarceration, he attended five, two-hour visitations in seven months—hardly sufficient time to bond with a child less than two years old. To his credit, he has completed a parenting class but he has not demonstrated he is able to put to use what he has learned. He also

15

failed to satisfy many material elements of his service plan. *In the Interest of E.A.F.*, 424 S.W.3d 742, 752 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (considering failure to participate in services required for unification in best-interest determination). On the other hand, C.S. has shown significant progress in overcoming his previous medical complications resulting from his premature birth and mother's drug use while living with his foster family. This factor also weighs against Appellant.

The fifth *Holley* factor relating to programs available to assist Appellant to promote his son's best interest also weighs against Appellant. With the exception of possibly applying for food stamps, Appellant identified no such programs in the trial court. Further, although the Department had programs available to assist Appellant to promote the best interest of C.S., Appellant was either unable or unwilling to participate in and take advantage of most of those programs. *See In the Interest of X.R.L.*, 461 S.W.3d 633, 649 (Tex. App.—Texarkana 2015, no pet.).

The sixth *Holley* factor relating to Appellant's future plans if C.S. is placed with him also weighs against Appellant. The evidence indicated Appellant had made few, if any, plans for his son. Appellant did not identify any specific daycare his son would be attending or any doctor that would be taking care of his son's future needs.

The seventh, and perhaps most important, *Holley* factor relates to the stability of C.S.'s future home or placement. At the conclusion of the final hearing, the evidence showed that Appellant would not be living in the four-bedroom residence with Julia and her family as he had represented. Instead, he testified he had been kicked out of Julia's house and had only recently rented a small efficiency apartment. Further, he did not

16

identify any persons that would assist him with his son's day-to-day care and reiterated that he would place his son in a daycare during the day while he was at work—a location discouraged by C.S.'s doctor because of his low immune system. Furthermore, the evidence reflected that Appellant had at least two relationships with two different women since his release, all while remaining married to C.S.'s mother. The multitude of Appellant's residences and the instability of his female relationships in the seven months during which the proceedings were pending weigh against the prospect that Appellant would provide the stability necessary to successfully raise a two-year old child. *See In the Interest of S.R.*, 452 S.W.3d 361, 367-68 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

The final *Holley* factors also weigh against Appellant. There was insufficient evidence whether there was an existing relationship between Appellant and C.S. and whether it was appropriate because Appellant spent so little time visiting his son. Further, his actions since his release from incarceration indicate that his living arrangements and relationships with women who would participate in caring for C.S. would be very unstable. *See In the Interest of D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.) (fact finder may infer from a parent's past inability to meet a child's physical and emotional needs an inability or unwillingness to meet a child's needs in the future). That he was unable to establish a stable home, find reliable transportation, and engage in meaningful personal relationships during the seven months following his release from incarceration indicates a probability that he is unlikely to do so in the near future. *Id.*

While we are not unsympathetic to Appellant's well-intended desire to maintain a parent-child relationship with C.S., based on the totality of the evidence, we find that the Department presented clear and convincing evidence to support the trial court's best interest finding. *See In re A.D.,* 203 S.W.3d 407, 411-12 (Tex. App.—El Paso 2006, pet. denied). Appellant's sole issue is overruled.

CONCLUSION

The trial court's order terminating Appellant's parental rights to his son, C.S., is affirmed.


Patrick A. Pirtle
Justice